DURANT v STATE OF MICHIGAN

Docket No. 230859. Submitted September 6, 2001, at Lansing. Decided
May 10, 2002, at 9:25 A.M. Leave tp appeal sought.

Donald S. Durant and 457 other taxpayers, 423 school districts, and 33
intermediate school districts brought an original action in the Court
of Appeals, seeking both a judgment declaring that the Department
of Education, the Department of Management and Budget, and the
State Treasurer have underfunded the school-funding obligations of
the state under Const 1963, art 9, § 29 (the Headlee Amendment),
Const 1963, art 9, § 11 (Proposal A), and the State School Aid Act,
MCL 388.1601 *et seq.*, as amended by 2000 PA 297, and a money
judgment in the amount of the alleged underfunding. The plaintiffs
specifically alleged that the appropriation of funds under 2000 PA
297 failed to meet the state's obligations under Proposal A and the
Headlee Amendment.

In an opinion by SAWYER, J., and separate opinions by NEFF, P.J.,
and FITZGERALD, J., concurring with the legal conclusions reached
by Judge SAWYER, the Court of Appeals *held*:

1. Funds allocated in subsection 20(1) of 2000 PA 297 to the
"foundation allowance" per membership pupil may be used to meet
the state's obligations under both Proposal A and the Headlee
Amendment as long as the foundation allowance is equal to, or
greater than, the sum of the state's obligations under Proposal A
and the Headlee Amendment. The funding scheme contained in
2000 PA 297 is constitutional. Any use of that portion of the per
pupil foundation allowance fixed in subsection 20(1) that remains
after the state has funded the local school districts at the 1994-95
level to fund the state's Headlee Amendment obligation is not con-
stitutionally prohibited.

2. The constitution imposes two obligations on the Legislature
with respect to school funding. Proposal A requires the Legislature
to provide funding at the minimum level provided in 1994-95,
approximately $5,000 per pupil. The Headlee Amendment obliges
the state to provide certain special education funding in addition to
the minimum funding of $5,000 per pupil. The constitution is satis-
fied if the amount appropriated by the Legislature meets the state's
total minimum funding obligation.

SAWYER, J., stated that it does not matter what label the Legislature chooses to place on various funding components or whether there is a commingling of funds under common labels. What matters is whether the total appropriation meets or exceeds the minimum funding levels imposed by Proposal A and the Headlee Amendment. This result is achieved by 2000 PA 297.

NEFF, P.J., concurring, stated that the legal conclusion reached in this matter is supported by a strict legal analysis of the legislative scheme of 2000 PA 297 and the constitution. The funding scheme in 2000 PA 297, and the resulting freeze of the foundation allowance, is a subterfuge, a shell game, but one that the strict language of the constitutional amendment, divorced from the common understanding of the voters who approved Proposal A, allows. The outcome in this case does not keep faith with the implementing legislation, 1993 PA 336, or with what state officials told voters Proposal A meant. The revision of the school aid allocation scheme found in 2000 PA 297 is contrary to the intent of the ratifiers of Proposal A and is not what the voters understood would happen when they passed Proposal A.

FITZGERALD, J., concurring, stated that the legal conclusion reached in this matter is supported by the strict language of Proposal A. This conclusion does not comport with the common understanding of the voters who approved Proposal A. However, where, as here, the text of the constitutional provision is unambiguous, the interpretation that the great mass of the people themselves would give the provision is of no regard.

Summary disposition must be granted in favor of the defendants.

*Pollard & Albertson, P.C.* (by *Dennis R. Pollard* and *Richard E. Kroopnick*), for the plaintiffs.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, *Jane O. Wilensky, Edith C. Harsh, Deborah Anne Devine, Gary L. Hicks, Matthew H. Rick,* and *Darrin F. Fowler,* Assistant Attorneys General, for the defendants.

Amicus Curiae:

*White, Schneider, Baird, Young & Chiodini, P.C.* (by *James A. White* and *Kathleen Corkin Boyle*), for Michigan Education Association.

Before: NEFF, P.J., and SAWYER and FITZGERALD, JJ.

SAWYER, J. This original action,[1] commonly referred to as *"Durant III,"* requires this Court to revisit and reexamine the interplay between Const 1963, art 9, § 29 (the Headlee Amendment), Const 1963, art 9, § 11 (Proposal A), and the State School Aid Act, MCL 388.1601 *et seq.*, as amended by 2000 PA 297, as well as to expand on this Court's *Durant II* decision, *Durant v Michigan (On Remand)*, 238 Mich App 185; 605 NW2d 66 (1999), vacated in part on other grounds and remanded, reconsideration den 462 Mich 882 (2000).

In response to this Court's decision in *Durant II*, the Legislature enacted 2000 PA 297. Plaintiffs now challenge the constitutionality of that act. For the reasons expressed below, we conclude that 2000 PA 297 is constitutional.

2000 PA 297 creates a tripartite funding scheme the parties refer to as either the "three bucket" or the "three pot" approach. The state provides an overview of this approach in its brief in opposition to plaintiffs' motion for summary disposition as follows:

> 1. Allocate the appropriation for the state share of the Proposal A obligation at the 1994-95 level. (§ 22a).
>
> 2. Allocate the appropriation for the Headlee Amendment obligations at the state financed proportions for special education and special education transportation. (§ 51c).
>
> 3. Calculate the amount under the former appropriation sections (§§ 20, 20j, 51a(2), 51a(3) and 51a(12)).

---

[1] Lead plaintiff Donald S. Durant, who has lent his name to a series of lawsuits brought over the past twenty years to enforce the provisions of the Headlee Amendment, Const 1963, art 9, §§ 25-31, died in March 2001, during the pendency of this action.

4. The appropriations made under Step 1 (§ 22a) and Step 2 (§ 51c) are subtracted from the total in step 3.

5. The remainder equals the § 22b appropriation, an additional discretionary payment.

Sum of former appropriation sections

- 22a appropriation (Proposal A obligation)
- 51c appropriation (Headlee Amendment obligation)

―――――――――

= 22b appropriation.

A more detailed explanation of this three-bucket funding method is set forth in a February 6, 2001, Department of Education Bulletin as follows:

PAYMENT MECHANISM UNDER THE *DURANT* SOLUTION (*NEW* Sections 22a, 22b, and 51c)

Beginning in FY2001, foundation allowance payments and supplemental payments to local school districts and PSAS will no longer be paid out of Section 20 and 20j and special education payments to those entities will no longer be paid out of Section 51a. Rather, the amounts calculated pursuant to those sections will be used to determine the amount of state payments under NEW Section 22b. This payment mechanism, described below, has been designed to demonstrate the State's compliance with the foundation allowance guarantee under Proposal A and the minimum special education reimbursement obligation pursuant to the Headlee amendment:

*Section 22a* allocates a per pupil amount to meet the Proposal A guarantee of a FY95 foundation allowance per pupil.

*Section 51c* allocates an amount to meet the Headlee obligation equal to 28.6138% of a district's special education costs plus 70.4165% of the district's special education transportation costs.

*Section 22b* allocates a discretionary payment equal to the sum of the calculated amounts under Sections 20, 20j,

51a(2), 51a(3), and 51a(12) minus the amounts paid in Sections 22a and 51c.

*NEW Section 22a* allocates to each local school district, university school, and public academy that operated during FY95 and is in operation in the current year an amount per pupil sufficient to guarantee revenue in the amount of its FY95 total state and local per pupil revenue for school operating purposes, as guaranteed under Section 11 of Article IX of the State Constitution of 1963 ("Proposal A"). The payments under this section for *a local school district* will be calculated by subtracting from the FY95 foundation allowance or $6,500.00, whichever is less, the current year per pupil local operating revenue from the nonhomestead millage levy. The figure used for the current year per pupil local operating revenue is equal to the current year nonhomestead taxable value (less any captured assessed valuation under TIFA, LDFA, DDA, or Brownfield), multiplied by the lesser of 18 mills or the number of mills levied by the district for FY94, divided by the district's current year membership. If a *hold harmless district's* FY95 hold harmless millage rate, as certified by the Department of Treasury for the 1994 tax year, multiplied by the district's current year taxable value per pupil no longer generates the full hold harmless amount per pupil (that is, the difference between the district's FY95 foundation allowance and $6,500.00), the amount paid under Section 22a will be increased to include that shortfall. The per pupil payments under this section for a *university school or PSA* that was in operation in FY95 and is operating in the current year will be equal to the university school's or PSA's FY95 per pupil payment under Section 20.

*NEW Section 51c* allocates to districts (including a university school and PSAS) an amount equal to 28.6138% of total approved costs of special education (excluding costs reimbursed under section 53a), and 70.4165% of total approved costs of special education transportation.

*NEW Section 22b* allocates to districts (including a university school and PSAS) an amount equal to the difference between the sum of the calculations under Section 20

(foundation allowance), 20j (hold harmless supplemental), 51a(2) (special education foundation allowances and "categorical" payments), 51a(3) (special education "hold harmless"), and 51a(12) (other special education foundation allowances); minus the payments made under new Sections 22a and 51c. These Section 22b payments are not to be considered per pupil revenue for school operating purposes under Section 11 of Article IX of the State Constitution. Finally, in order to receive these funds, districts are required to administer a standardized department-approved assessment of basic educational skills for pupils in grades first through fifth.

The practical effect of this three-bucket approach is that, although subsection 20(1) of 2000 PA 297 sets the basic foundation allowance at $5,700 per membership pupil for 1999-2000, at $6,000 per membership pupil for 2000-01, at $6,300 per membership pupil for 2001-02, and at $6,700 per membership pupil for 2002-03, the state is calculating and funding its obligation under art 9, § 11 at a level not less than "the 1994-95 total state and local per pupil revenue for school operating purposes" for each particular school district. The per membership pupil amount for the 1994-95 fiscal year was $5,000. Although the parties are less than clear on this point, it appears that the funds that compose the difference between the 1994-95 foundation allowance and the basic foundation allowances specified in subsection 20(1) of 2000 PA 297, other than the Headlee obligation allocation, are poured into the discretionary funds bucket.

This leads us to the current litigation. Plaintiffs are 458 taxpayers, 423 school districts, and 33 intermediate school districts, who have commenced this original action pursuant to Const 1963, art 9, § 32, MCR 2.605, and MCR 7.216(A)(7), seeking both a judgment

declaring that the state has underfunded its constitutional obligation under art 9, § 29 and a money judgment in the amount of this underfunding. The gravamen of plaintiffs' claim is set forth in paragraphs 23 and 24 of count I of their second amended complaint:

23. However, in enacting 2000 PA 297, the defendant state has again utilized revenue guaranteed to school districts in Michigan for general or unrestricted school operating purposes, *i.e.*, "foundation allowance revenue," pursuant to Proposal A in order to satisfy the state's independent and additional funding obligation to those school districts under § 29 of the Headlee Amendment in order to defray the costs incurred by those school districts to provide special education programs and services, inclusive of special education transportation services, in the proportion which applied in 1978 when the Amendment was adopted.

24. By operation of 2000 PA 297, school districts in Michigan were unconstitutionally underfunded Three Hundred Ninety-Six Million Five Hundred Thirty Thousand Two Hundred Four Dollars ($396,530,204.00) for the 1999-2000 school year and are presently being underfunded Four Hundred Seventeen Million Four Hundred Three Thousand One Hundred Fifty-Eight Dollars ($417,403,158) for the 2000-2001 school year and will be underfunded Four Hundred Fifty-Two Million One Hundred Thirty-Three Thousand Two Hundred Fifty Dollars ($452,133,250.00) for the 2001-2002 school year and will be underfunded Four Hundred Sixty-Six Million Ninety-Five Thousand One Hundred Twenty-Three Dollars ($466,095,123.00) for the 2002-2003 school year because per pupil revenue guaranteed to school districts in Michigan for general or unrestricted school operating purposes pursuant to Proposal A, Const 1963, art 9, § 11, *as amended*, has been allocated or transferred in order to satisfy the state's independent and additional funding obligation to those school districts pursuant to § 29 of the Headlee Amendment, Const 1963, art 9, § 29, for the costs incurred to provide special education programs and services, inclusive of special education transportation ser-

vices, in the proportion which applied in 1978 when the Amendment was adopted.

The essence of plaintiffs' argument is that once the Legislature has allocated money to the "foundation allowance," that money is unavailable to satisfy the state's obligations under the Headlee Amendment even if that foundation allowance is greater than the minimum required under art 9, § 11. The essence of defendants' argument is that funds allocated to the "foundation allowance" may be used to meet the state's obligations under both Proposal A and the Headlee Amendment as long as that foundation allowance is equal to, or greater than, the sum of the state's obligations under Proposal A and the Headlee Amendment. We agree with defendants.

Plaintiffs assert with dispositive conviction that the fact that each school district will receive exactly the same amount that it would have received under the funding scheme struck down in *Durant II* is proof certain that the funding scheme employed in 2000 PA 297 is nothing more than a "shell game" that is equally unconstitutional. However, even if true, this does not render the three-bucket funding scheme unconstitutional per se. The fact that each school district might receive the same amount of funding under 2000 PA 297 that it received under 1997 PA 142 and 1998 PA 339 is of no moment with regard to the constitutionality of the funding scheme.

*Durant II* stands generally for the propositions that Michigan's Constitution prohibits the Legislature from using the per pupil funding guaranteed by Proposal A to satisfy the state's obligation under the Headlee Amendment and that such a use of per pupil funding guaranteed by Proposal A not only violates art 9, § 11,

but also results in an underfunding of the state's obligation under the Headlee Amendment in the amount of Proposal A funds dedicated to satisfying the state's Headlee Amendment obligation. *Durant II*, 238 Mich App 189-190, 212-213. Plaintiffs now assert that *Durant II* stands for the proposition that Proposal A constitutionally guarantees that each school district will receive the entire per pupil foundation allowance fixed in subsection 20(1) of 2000 PA 297 as unrestricted per pupil funding to reimburse general school operating costs exclusive of the costs of special education activities, services, and transportation. The state asserts that the Proposal A amendment of art 9, § 11 guarantees only that local school districts will receive combined state and local per pupil revenues for school operating purposes that are not less than the 1994-95 level. Accordingly, the key question before this Court for resolution is what is the extent of the state's funding obligation under art 9, § 11, a question neither raised by the parties nor directly addressed by this Court in *Durant II*.

If plaintiffs offer the correct construction of art 9, § 11, then the state has underfunded its Proposal A obligation and is precluded from pouring into the discretionary use bucket any portion of the foundation allowance fixed in subsection 20(1) and from using any portion of that foundation allowance to fund the state's Headlee Amendment obligation. If the state is correct, then any use of that portion of the per pupil foundation allowance fixed in subsection 20(1) of 2000 PA 297 that remains after the state has funded the local school districts at the 1994-95 level to fund the state's Headlee Amendment obligation is not constitutionally prohibited.

At issue is the meaning of the following constitutional language:

> Beginning in the 1995-96 state fiscal year and each state fiscal year after 1995-96, the state shall guarantee that the total state and local per pupil revenue for school operating purposes for each local school district shall not be less than the 1994-95 total state and local per pupil revenue for school operating purposes for that local school district . . . . [Const 1963, art 9, § 11.]

The rule of "common understanding" is the primary rule of constitutional interpretation. *Durant II*, 238 Mich App 210. The parameters of this rule have been articulated as follows:

> " 'A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark and abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed." ' " [*Durant v Michigan*, 456 Mich 175, 192; 566 NW2d 272 (1997) (*Durant I*), quoting 1 Cooley, Constitutional Limitations (8th ed), p 143.]

Although evidence of the common understanding of the voters may be ascertained from the " 'times and circumstances' " surrounding the ratification of the constitutional provision and the purposes sought to be accomplished, *Durant I*, 456 Mich 192, quoting *People v Harding*, 53 Mich 481, 485; 19 NW 155 (1884); *Soap & Detergent Ass'n v Natural Resources*

*Comm*, 415 Mich 728, 745; 330 NW2d 346 (1982), these tools are used only when necessary to clarify the meaning of the constitutional language in the absence of guidance from the language itself. *Committee for Constitutional Reform v Secretary of State*, 425 Mich 336, 340-341; 389 NW2d 430 (1986); *Univ of Michigan Regents v Michigan*, 395 Mich 52, 60; 235 NW2d 1 (1975).

The language employed in art 9, § 11 is clear and uncomplicated. Assigning each word and phrase its common meaning, the great mass of the people would have understood from the amending language that art 9, § 11 "guarantees" that the state will provide each "local school district" with a minimum or base level of funding that cannot be less than "the 1994-95 total state and local per pupil revenue for school operating purposes . . . ." This minimum level of funding is to be calculated on the basis of the number of pupils to which the individual school districts provide educational services and instruction, as reflected by the common understanding of the phrase "per pupil revenue." Although various state officials may have represented to the public that the foundation allowance constitutes the funding guaranteed under Proposal A, the term "foundation allowance" appears nowhere in the text of art 9, § 11. Moreover, this Court in *Durant II*, 238 Mich App 191, never held that it was the foundation allowance that was constitutionally guaranteed, but did indicate, instead, that art 9, § 11 guaranteed only a "specific base level of unrestricted aid per pupil . . . ." *Durant II*, 238 Mich App 212-213.

In light of the clear language of art 9, § 11, the construction of art 9, § 11 advocated by the schools would impose limitations on the Legislature's appro-

priation discretion not envisioned by Proposal A, and this Court may not construe a constitutional provision to impose limitations on the Legislature not intended by the ratifiers of the constitutional provision. *Judicial Attorneys Ass'n v Michigan*, 460 Mich 590, 604-607; 597 NW2d 113 (1999); *Durant II*, 238 Mich App 208. There is nothing in the plain language of art 9, § 11 that would constitutionally preclude the Legislature from establishing a foundation allowance and allocating from this amount an amount sufficient to fund the base level of per pupil funding guaranteed by art 9, § 11 and then pouring the remaining funds allocated to the foundation allowance that exceed the base level of per pupil funding guaranteed by art 9, § 11 into the discretionary use bucket or the Headlee allocation bucket. To the extent that the three-bucket funding scheme has shortcomings of a nonconstitutional nature, such inequities are not a matter for this Court to redress, but instead, must be left to what redress, if any, may be achieved through the political process. *Judicial Attorneys Ass'n, supra* at 604-605.

In short, the constitution imposes two obligations on the Legislature with respect to school funding. First, under Proposal A, it must provide funding at the minimum level provided in 1994-95, or approximately $5,000 per pupil. Second, under the Headlee Amendment, the state is obligated to provide certain special education funding in addition to the minimum funding of $5,000 per pupil. These sums added together represent the total minimum funding obligation of the state under the constitution. If the amount appropriated by the Legislature meets that minimum amount, then the constitution is satisfied.

For example, consider the hypothetical XYZ School District, which has one hundred students. The Legislature must appropriate under Proposal A a minimum of $500,000 (one hundred pupils times $5,000 per pupil to meet the 1994-95 funding level obligation). Additionally, let us say that the state's special education funding required by the Headlee Amendment for the XYZ School District is $50,000. In such case, the Legislature would meet its constitutional obligations under Proposal A and the Headlee Amendment as long as it appropriates a minimum of $550,000 to the XYZ School District ($500,000 under Proposal A plus $50,000 under the Headlee Amendment).

Plaintiffs would have us look at the label, not the substance, placed on various school funding components by the Legislature. That is, the essence of their position is that, once the Legislature has labeled money "foundation allowance," that money is unavailable to satisfy the Legislature's obligations under the Headlee Amendment *even where that "foundation allowance" is in excess of the minimum required by Proposal A.* Not only does this argument elevate the label over the substance, it also completely ignores the fact that art 9, § 11 does not even employ the term "foundation allowance." The label itself is a creation of the Legislature.

We must look past the labels and grasp the substance. The substance of the constitution is that the Legislature must appropriate a certain minimum amount of money to each school district on the basis of the 1994-95 funding levels plus additional obligations imposed under the Headlee Amendment. The substance of 2000 PA 297 is that the Legislature has met this obligation. And just as the Legislature may

not employ labels at the expense of substance to avoid restrictions imposed by the constitution, neither can this Court employ labels in the absence of substance to create mandates not found in the constitution.

In short, it matters not what label the Legislature chooses to place on various funding components or whether there is a commingling of funds under common labels. What matters is whether the total appropriation meets or exceeds the minimum funding levels imposed by Proposal A and the Headlee Amendment. 2000 PA 297 achieves that result. It is, therefore, constitutional.

In light of our resolution of this issue, we need not address the procedural issues raised by the parties.

Summary disposition is granted to defendants. No costs, a question of public importance being involved.

NEFF, P.J. *(concurring)*. While I concur with the legal conclusion reached by my colleagues, I write separately to express my recognition that the right result lingers beneath the bare language of Const 1963, art 9, § 11 (Proposal A). This case can be summed up in one sentence: "That may be what the Constitution says, but *it is not* what it means." The outcome in this case does not keep faith with the implementing legislation, 1993 PA 336. It does not keep faith with what state officials told voters Proposal A meant. Most importantly, it is undoubtedly not what the voters understood when they passed Proposal A by an overwhelming margin in 1994.

The primary rule of constitutional interpretation is the rule of "common understanding." *Durant v Michigan (On Remand)*, 238 Mich App 185, 210; 605 NW2d

66 (1999) (commonly referred to as *Durant II*). A constitutional provision should be given that interpretation " 'which reasonable minds, the great mass of the people themselves, would give it,' " taking into account the times and circumstances under which the constitution was adopted. *Id.* at 211 (quoting *Durant v Michigan*, 456 Mich 175, 192; 566 NW2d 272 (1997) (*Durant I*). However, such rules of interpretation are employed only where the text of the constitutional provision is indeterminate. *MGM Grand Detroit, LLC v Community Coalition for Empowerment, Inc*, 465 Mich 303, 309; 633 NW2d 357 (2001); *Michigan Coalition of State Employee Unions v Civil Service Comm*, 465 Mich 212, 222; 634 NW2d 692 (2001).

I

Const 1963, art 9, § 11 provides:

> There shall be established a state school aid fund which shall be used exclusively for aid to school districts, higher education, and school employees' retirement systems, as provided by law. Sixty percent of all taxes imposed at a rate of 4% on retailers on taxable sales at retail of tangible personal property, 100% of the proceeds of the sales and use taxes imposed at the additional rate of 2% provided for in section 8 of this article, and other tax revenues provided by law, shall be dedicated to this fund. Payments from this fund shall be made in full on a scheduled basis, as provided by law. Beginning in the 1995–96 state fiscal year and each state fiscal year after 1995–96, the state shall guarantee that the total state and local per pupil revenue for school operating purposes for each local school district shall not be less than the 1994–95 total state and local per pupil revenue for school operating purposes for that local school district, as adjusted for consolidations, annexations, or other boundary changes. However, this guarantee does not apply in a year in which the local school district levies a millage rate

for school district operating purposes less than it levied in
1994.

I agree with my colleagues that the specific lan-
guage of art 9, § 11 does not require that the annual
foundation allowance set by the Legislature be allo-
cated as unrestricted per pupil operating revenue.
However, a review of the times and circumstances
surrounding the passage of Proposal A leaves no
doubt that these two school finance terms were sold
to the voting public as one and the same. Per pupil
revenue is the common language of school finance.
Despite the rhetoric, everything boils down to a per
pupil revenue amount when it comes time for com-
parisons. How much is it this year? How much will it
increase next year?

The history of Proposal A leaves no doubt that the
"per pupil revenue" in art 9, § 11 is a cross reference
to the "foundation allowance" in subsection 20(1) of
the State School Aid Act, MCL 388.1620(1), 2000 PA
297, subsection 20(1)—the unrestricted school operat-
ing funds promised as the cornerstone of Michigan's
school finance reform. "The *per pupil* funds guaran-
teed by art 9, § 11 are commonly referred to as the
'foundation allowance.' " *Durant II, supra* at 197. A
review of the times and circumstances surrounding
the passage of Proposal A shows that the annual
foundation allowance enacted by the Legislature in
subsection 20(1) of the State School Aid Act *was
understood to be* the constitutionally guaranteed per
pupil revenue allocated to local districts to operate
schools. There was no disconnect between the pro-
posed constitutional language and the legislatively
enacted language: different terms, same meaning.

II

Proposal A altered the constitutionally prescribed tax revenue base for public education. Historical notes to Const 1963, art 9, § 11; *Durant II, supra* at 196-197. With the passage of 1993 PA 145 and 1993 PA 336, the Legislature eliminated local property tax revenue as the primary source of public school funding and replaced formula funding with a "foundation grant" system, which distributed state aid payments to each local school district through a foundation allowance per membership pupil. 1993 PA 336, § 20; *Durant II, supra* at 196, 212.

The specifics with regard to how this funding mechanism would operate were set forth in 1993 PA 336. Section 20 of 1993 PA 336 established a statewide basic foundation allowance to begin at $5,000 per pupil in combined state and local revenue for the 1994-95 state fiscal year, with the amount of the foundation allowance to be adjusted each year on the basis of changes in state tax revenues and local school district pupil counts. 1993 PA 336, subsections 20(1) and (2).

Subsection 20(2) of 1993 PA 336 provided in relevant part:

> For 1995-96 and each succeeding fiscal year, the basic foundation allowance shall be determined by multiplying the amount of the basic foundation allowance for the immediately preceding state fiscal year by the final index calculated under this subsection. The result is the amount of the basic foundation allowance per membership pupil for the current state fiscal year.

The practical import of subsection 20(2) was that the foundation grant would be adjusted for future fiscal

years by the percentage change in the growth of State
School Aid Fund revenue, adjusted by any change in
the pupil membership of a school district.

When the Legislature enacted 1993 PA 336, voters
were thereafter faced with two choices on March 15,
1994: (1) pass Proposal A, raising the sales tax and
securing guaranteed funding for schools in the consti-
tution, or (2) defeat Proposal A, raising the income
tax and providing no guarantees regarding school
funding. Either way, the *foundation grant system* of
funding schools was implemented.[1] The difference
was that Proposal A guaranteed the foundation grant;
the alternative, the statutory plan, did not.

If voters approved Proposal A, the State School Aid
Fund would provide each school district with a foun-
dation grant of per pupil revenue as unrestricted
funding, guaranteed not to fall below the amount
established for 1994-95, essentially $5,000. 1963 Const,
art 9, § 11; Senate Fiscal Agency, *Issue Paper: School
Finance Reform, Analysis of the Ballot and Statutory
Reform Proposals*, January 10, 1994, p 18. *In addition
to the per pupil foundation allowance*, local school
districts would continue to receive certain categorical
funding, including special education funding man-
dated under Const 1963, art 9, § 29 (the Headlee
Amendment). House-Senate Fiscal Agency, *The Mich-
igan School Aid Act Compiled and Appendices*, Octo-
ber 1994, pp 56, 64 (Table 3). This is the promise of
Proposal A that has been perverted by semantic
hijinks, shown by the artificial distinction drawn

---

[1] "[S]chools will be funded at a world-class level no matter how you
choose." Opinion of Governor John Engler, presented in *Proposal A[,] Is
There a Better Way to Fund Schools, Help Economy?*, The Detroit Free
Press, March 11, 1994, p 11A.

between the per pupil revenue language of Proposal A and the foundation grant language of the legislation.

III

An examination of voter information concerning Proposal A in the three-month period between the effective date of § 20 of 1993 PA 336 and the election, reports of voter sentiment, and official statements by Proposal A proponents, leave no doubt that art 9, § 11, as amended, was commonly understood to guarantee the annual foundation allowance set by the Legislature in subsection 20(1) as local school per pupil revenue for district operating expenses.

Proposal A passed by a sixty-nine to thirty-one percent margin. *Durant II, supra* at 197. The pro-Proposal A message to voters was that Proposal A had "built-in safeguards to foster fairness for consumers, taxpayers and the state's 1.5 million school children":

> Proposal A is more than a choice between raising the sales tax to 6 percent vs. raising the state income tax to 6 percent under a backup plan.
>
> The ballot measure offers what schools have desperately sought for decades—reliable, stable funding.
>
> *          *          *
>
> For taxpayers and consumers, let's compare Proposal A to the backup plan
>
> Proposal A is a *constitutional amendment*, making it *tamper-resistant*. Changing it requires another ballot question or a three-fourths vote by both state houses.

"Plan B," as some call the backup plan, is constructed by
the Legislature and thus prone to the fancies of current and
future lawmakers.

*Constitutionally-mandated school funding* enhances sta-
bility. The divisive and dicey millage votes which schools
have depended on for decades will be largely gone. There
should be no more Kalkaskas—schools that shut down in
mid-school year because they've run out of money.

* * *

Michigan voters hold history in their hands, and should
make the most of it with a resounding "yes" on March 15.
[Editorial, *Proposal A, It's fairest for taxpayers, school
kids,* Lansing State Journal, February 27, 1994, p 6A.]

The "guarantee" of a foundation grant dedicated to
school operating expenses as per pupil revenue was a
constant refrain in voter information regarding Propo-
sal A. For example, shortly after the passage of the
school finance package on Christmas Eve 1993, Gov-
ernor Engler touted Proposal A as the right choice for
voters in his 1994 State of the State address, urging
voters to pass Proposal A because it would, among
other things, provide: *"Constitutionally guaranteed
full funding for public schools."* (Emphasis added.)

The Governor's casting of Proposal A as a constitu-
tional guarantee of full funding for schools was
adopted in other analyses of Proposal A:

The current [State School Aid] formula will be completely
replaced by a *guaranteed foundation allowance* that will
provide state funds for all districts.

* * *

The *guaranteed foundation allowance* for 1994-5 will be
$5,000 per membership pupil. This amount will annually be
indexed to: 1) the growth in the state revenues that are

dedicated to the state school aid fund, and 2) changes in the number of pupils. This double indexing provision is designed to ensure that the state will have the capacity to fund schools in future years. [Harvey, Moore & VerBurg, *March 15, 1994 Ballot Issue, Michigan's Public Education: School Reform and Funding Changes*, Michigan State University Extension, p 3.]

Voters were informed that constitutional amendments under the ballot plan "[g]uarantee that the total state and local per pupil revenue for school operating in future years will not be less than the amount for 1994-5." *Id.* at 4. The common understanding was not only that Proposal A guaranteed base operating funds for local schools, but also that these funds would normally increase year to year:

Under the new system, school aid is based on a per-pupil foundation grant, where districts receive a flat amount per pupil and locally raised school mills are much less important than in the past.

\*    \*    \*

Once reached, the $5,000 foundation grant will *increase* each year at the same rate as state school aid fund revenue, adjusted for the change in pupil count. Categorical funding will be rolled into the foundation grant, with the exception of special education, adult education, and a few other programs.

\*    \*    \*

FY 1994-95 funding will be distributed to districts with a base between $4,200 and $6,500 per student according to a formula. This formula *guarantees* each district an increase in funding over FY 1993-94 levels, but the more a district now spends, the smaller its increase.

\*    \*    \*

> Districts that now spend more than $6,500 per pupil are
> *guaranteed* $160 per pupil more than they spend in 1993-94.

*     *     *

> The FY 1994-95 state payment to districts with a founda-
> tion *guarantee* of $6,500 per pupil or less is the difference
> between the foundation *guarantee* and local revenue per
> pupil . . . . Under both plans the FY 1994-95 state payment
> to districts with a foundation *guarantee* of more than
> $6,500 per pupil is the difference between $6,500 and local
> revenues per pupil. [Cummings, *School Finance Reform:
> Which Districts Will Benefit Most?*, Public Sector Consul-
> tants, Inc, February 14, 1994, pp 1-2 (emphasis added).]

The message to voters was that the foundation
grant of unrestricted per pupil revenue was guaran-
teed by Proposal A, subject to a minimum floor level
of $5,000 per pupil:

> The constitutional amendment also guarantees that 60
> percent of all sales tax revenues resulting from the current
> 4-percent rate, plus 100 percent of all revenues raised by
> the additional 2 percentage points in the sales tax rate, will
> be earmarked for a constitutionally established school aid
> fund. The amount of money spent on schools this year is
> *constitutionally guaranteed as a floor* for school spending
> in all future years.
>
> *Thus, the constitutional amendment would prevent a
> direct repeat of the state lottery gimmick, in which lottery
> money went into the school aid fund, but other school aid
> appropriations were cut.* [*Preventing More Tax Hikes*, The
> Detroit News, January 23, 1994, p 2B (emphasis added).]

The Detroit Free Press attributed similar statements
to official sources: According to administration offi-
cials, "the ballot proposal guarantees a *minimum*
level of funding," which would better protect schools
in the event that tax revenues plummeted unexpect-
edly. Bell, *The Other Shoe Drops in Fight over Which*

*Tax Gets Big Boost,* The Detroit Free Press, February 26, 1994, p 1A (emphasis added).

As recently as October 2001, explanations of Proposal A continued to equate the foundation allowance set in subsection 20(1) of the State School Aid Act with the per pupil funding guaranteed in art 9, § 11 and represent that this per pupil funding has constantly increased:

> The two key provisions of [P]roposal A were (1) the replacement of most school property taxes with an increased sales and other use taxes and (2) the adoption of a minimum "foundation" grant of $5,000 per pupil that would come from the state. This school year, the foundation grant is set at $6,500 per pupil.
>
> Proposal A had five major objectives: (1) Reduce property taxes; (2) Reduce reliance on local property taxes to provide school funding; (3) Increase the state's share of school funding; (4) Assure a minimum level of per pupil funding; and (5) Reduce the funding disparities between school districts.
>
> Since the passage of Proposal A seven years ago, most people agree that all of the major objectives have been achieved.
>
> *       *       *
>
> *Proposal A guarantees each district a minimum level of per pupil funding.* In 1994, fifty-five percent of Michigan's school districts were getting less than $4,500 per student. In the 2001-02 school year, all Michigan school districts will receive at least $6,500 per student. Since the passage of Proposal A, overall state per pupil funding has outpaced the rate of inflation. [*School Finance Reform Lessons from Michigan,* Testimony by Matthew I. Brouillette, Director of Education Policy, Mackinac Center for Public Policy, Prepared for the Pennsylvania House of Representatives, Select Committee on Public Education Funding, October 10, 2001, <http://www.psrn.org/SC%20Oct%2010%20armstrong/ed%20policy.html>.]

The common understanding of art 9, § 11 undoubtedly was consistent with this information.

Proposal A was presented to voters in combination with 1993 PA 336, so closely linked that when voters adopted Proposal A, the implementing legislation, already enacted, automatically activated. The plan laid before voters was a constitutionally guaranteed per pupil revenue amount, enacted as the basic foundation allowance. Voters accepted this guarantee, no doubt adopting Proposal A with the understanding that it was tamper resistant. Nonetheless, changing financial times can tempt, even taint, later interpretation of constitutional mandates. *Lockwood v Comm'r of Revenue*, 357 Mich 517, 551-552; 98 NW2d 753 (1959).

IV

The allocation scheme in 2000 PA 297 breaks faith with all these representations and promises because it makes an artificial distinction—never intended or expressed—between the constitutionally guaranteed per pupil revenue and the legislative foundation grant. This legislative scheme begins in subsection 20(1) by setting forth the annual foundation allowance, i.e., per pupil revenue amount, for successive fiscal years from the State School Aid Fund. However, these foundation allowances are not allocated solely to unrestricted per pupil funding for general school operating costs as in the past and as promised the voters when they were urged to pass Proposal A. In fact, these foundation allowances now are not allocations at all; they are used only for calculation purposes as base figures.

The revision of the school aid allocation scheme found in 2000 PA 297 is most certainly contrary to the intent of the ratifiers of Proposal A. Rather than allocating the entire per pupil foundation allowance set in subsection 20(1) of 2000 PA 297 to local school districts for unrestricted reimbursement of school operating costs, the act creates a foundation allowance for computation purposes only, and, in effect, caps the actual foundation allowance payment to local school districts at $5,000, despite a State School Aid Act provision that identifies a higher per pupil foundation allowance, and despite public pronouncements by various elected officials identifying that higher per pupil foundation allowance as being the primary source of school funding. As a consequence, the per pupil revenue amount for local school districts for school operating expenses has been subjected to a de facto reduction on the balance sheet, but not in the eyes of the public. This funding scheme, this freeze of the foundation allowance, is a subterfuge, a shell game, but one that the strict language of the constitutional amendment, divorced from the common understanding of the voters who approved it, allows. Therefore, I reluctantly concur with my colleagues that a strict legal analysis supports the legislative scheme of 2000 PA 297.

FITZGERALD, J. (*concurring*). I agree that the legal conclusion reached by Judge SAWYER is supported by the strict language of Const 1963, art 9, § 11 (Proposal A). I write separately, however, because I share in Judge NEFF's concern that the conclusion does not comport with the common understanding of the voters who approved Proposal A. However, as Judge NEFF has aptly noted, the interpretation that the great

mass of the people themselves would give Proposal A is of no regard where the text of the constitutional provision is unambiguous.