*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TAXPAYERS FOR MICHIGAN CONSTITUTIONAL GOVERNMENT, STEVE DUCHANE, RANDALL BLUM, and SARA KANDEL,

Plaintiffs,

v

STATE OF MICHIGAN, DEPARTMENT OF TECHNOLOGY, MANAGEMENT AND BUDGET and OFFICE OF AUDITOR GENERAL,

Defendants.

FOR PUBLICATION
October 29, 2019

No. 334663
Original Action

ON RECONSIDERATION

Before: BORRELLO, P.J., and METER and SHAPIRO, JJ.

METER, J. (*concurring in part/dissenting in part*).

I concur with the majority of the lead opinion's well-reasoned analysis. I dissent, however, from the lead opinion's analysis of Count II of plaintiffs' complaint. As noted in the lead opinion, Const 1963, art 9, § 30 provides that the "proportion of total state spending paid to all units of Local Government, taken as a group, shall not be reduced below that proportion in effect in fiscal year 1978-79." The term "Local Government" is defined by Const 1963, art 9, § 33 as "any political subdivision of the state, including, but not restricted to, school districts, cities, villages, townships, charter townships, counties, charter counties, authorities created by the state, and authorities created by other units of local government." I would find that a Public School Academy (PSA) is neither a "political subdivision of the state," generally, nor a "school district," specifically, within the meaning of § 33 and, thus, is not a species of local government for purposes of § 30. Because a PSA is not a species of local government, state spending paid to a PSA is not state spending paid to a unit of local government and § 33 bars the state from classifying it as such.

-1-

I. POLITICAL SUBDIVISION OF THE STATE

Plaintiffs argue that state funds disbursed to PSAs may not be included in the State's calculation of the proportion of total state spending paid to units of local government, taken as a group, under § 30. According to plaintiffs, funds disbursed to PSAs may not be classified as spending paid to local government because a PSA is not a political subdivision of the state as that term was commonly understood by the ratifiers of the Headlee Amendment in 1978. I agree.

A. PREVIOUS INTERPRETATIONS

Preceding the adoption of the Headlee Amendment, in OAG 1963-1964, No. 4037, our attorney general analyzed whether a county drain district constituted a political subdivision of the state for purposes of determining whether the state was obligated to provide social security coverage for employees of such a district. OAG 1963-1964, No. 4037, p 1. The attorney general described the "distinctive marks" of a political subdivision of the state as follows:

> The political divisions of the state are those which are formed for the more effectual or convenient exercise of political power within the particular localities. Originally, counties and townships, in which a uniform state policy is observable, composed this class almost or quite exclusively. Then, as population became denser in certain places, and there was added to this common design a special necessity for local government different from that proper to more rural districts, villages, towns and cities were constituted, and, as these were separated by their charters of incorporation from the townships of which they had before been part, and absorbed their functions, they also became political divisions. In these institutions, therefore, must be discovered the essential characteristics of their class, and they will be such common and prominent features as have co-existed with these organizations throughout their history, and are not possessed by other bodies of legislative creation which stand outside of the same category. These distinctive marks are, I think, that they embrace a certain territory and its inhabitants, organized for the public advantage, and not in the interest of particular individuals or classes; that their chief design is the exercise of governmental functions, and that to the electors residing within each is, to some extent, committed the power of local government, to be wielded either mediately or immediately, within their territory, for the peculiar benefit of the people there residing. Bodies so constituted are not merely creatures of the state, but parts of it, exerting the powers with which it is vested for the promotion of those leading purposes which it was intended to accomplish, and according to the spirit which actuates our republican system. They are themselves commonwealths; and therefore are properly entrusted with the sovereign power of taxation to meet their own necessities. [OAG 1963-1964, No. 4037, p 3 (internal citation and block notation omitted).]

The attorney general then opined that a county drainage district was not a political subdivision of the state because the drainage district could not operate as a body corporate where it had no

independent officers or its own drainage board, because its chief end was not the government of persons and things within its territory, but mere land improvement at the expense of the land, either through general taxation or special assessment, and because the electors of the district had no voice in the corporate affairs of the district. OAG 1963-1964, No. 4037, pp 6-8.

Shortly after the adoption of the Headlee Amendment, this Court analyzed whether Delta College, a community college district organized under state law, was a political subdivision of the state. *People v Egleston*, 114 Mich App 436; 319 NW2d 563 (1982). This Court began its analysis by summarizing the defining attributes of a political subdivision of the state as follows:

> The attributes which are generally regarded as distinguishing a political subdivision are its existence for the purpose of discharging some function of local government, its prescribed area and its authority for self-government through officers selected by it. The term "political subdivision" is both broad and comprehensive and denotes any division of a state made by the proper authorities for the purpose of carrying out a portion of those functions of the state which by long usage and the inherent necessities of government have always been regarded as public. It is not necessary that a political subdivision exercise all the functions of the state, but is sufficient if it is authorized to exercise a portion of them. [*Egleston*, 114 Mich App at 440 (internal citations omitted).]

With regard to the nature, structure and authority of a community college district, this Court observed:

> Const 1963, art 8, § 7 requires the Legislature to provide by law for the establishment and financial support of public community colleges to be supervised and controlled by locally elected boards. The governing body of the district is elected at large by the voters of the district. The district is a body corporate which may sue and be sued and may take, condemn, use, hold, sell, lease and convey real property without restriction as to location. MCL 389.103; MSA 15.615(1103). The governing board has the power to make plans for, promote, acquire, construct, own, develop, maintain and operate a community college and a vocational-technical education program. The board may borrow, subject to the provisions of 1943 PA 202, as amended, such sums of money on such terms as it deems desirable. It is authorized to borrow money and issue bonds for the obligation incurred, pursuant to MCL 389.122; MSA 15.615(1122) and MCL 389.126; MSA 15.615(1126). The district is specifically granted authority to adopt "bylaws, rules and regulations for its own government and for the control and government of the community college district." MCL 389.125; MSA 15.615(1125). The district is also empowered to do all other things in its judgment necessary for the proper establishment, maintenance, management and carrying on of the community college. MCL 389.125(f); MSA 15.615(1125)(f). [*Egleston*, 114 Mich App at 440-441.]

This Court then concluded that a community college district constituted a political subdivision within the plain meaning of the term. The Court elaborated:

We view three factors as most important in leading to the conclusion that a community college district is a "political subdivision" of the state for purposes of MCL 750.255; MSA 28.452. First, the governing body of the district is responsible only to its own electorate for its management of the district. No other political subdivision of the state exercises authority over the community college board. Second, the Legislature explicitly granted the board authority to adopt rules and regulations for its own government and for the control and government of the district. Third, the district's borrowing power is broad and similar to that of other political subdivisions of the state. We think that a community college district comes clearly within the plain meaning of the term "political subdivision". [*Egleston*, 114 Mich App at 441.]

## B. CHARACTERISTICS OF A PSA

The Legislature authorized the creation of PSAs in 1993 PA 362, which is commonly referred to as the charter schools act. *Council of Organizations and Others for Education about Parochiaid, Inc v Governor*, 455 Mich 557, 560-561; 566 NW2d 208 (1997); MCL 380.501 *et seq*. Consistent with our precedent, this Court must analyze Act 362 to ascertain whether the Legislature imprinted PSAs with the "distinctive marks" of a political subdivision of the state as identified in OAG 1963-1964, No. 4037 and *Egleston*.

Act 362 conferred on PSAs the status of "limited purpose" school districts. OAG 1995-1996, No. 6915, p 204 (September 4, 1996); see also OAG 2003-2004, No. 7154, pp 121-122 (March 31, 2004). Our Legislature considers PSAs to be school districts for the limited purpose of receiving state aid to schools from the State School Aid Fund. MCL 380.501(1). Our Legislature also conferred on PSAs the designation of "public school," "body corporate" and "governmental agency." MCL 380.501(1). "The powers granted to a public school academy . . . constitute the performance of essential public purposes and governmental functions of this state." MCL 380.501(1). These powers serve a local-government purpose, which is to implement "the actual intricacies of the delivery of specific educational services" to the students served by each respective PSA. *LM v State of Michigan*, 307 Mich App 685, 697; 862 NW2d 246 (2014). The students served by each authorized PSA are primarily those students who reside within the geographical boundaries of the body authorizing the PSA. MCL 380.504(3). PSAs may be authorized only by the board of a school district, the board of an intermediate school district, the board of a community college or the governing board of a state public university. MCL 380.501(2)(a)(*i*)-(*iv*).

A PSA is organized as a nonprofit corporation under the Nonprofit Corporation Act, MCL 450.2101, *et seq*. MCL 380.501(1); *Council of Organizations*, 455 Mich at 565. The governing body of a PSA is not elected at large by the voters of the geographic district of the authorizing body; rather, the governing body of a PSA is a board of directors composed of privately selected members, upon whom the Legislature has conferred the status of public officers who must "take the constitutional oath of office for public officers under section 1 of article XI of the state constitution of 1963." MCL 380.503(11). The authorizing body establishes by resolution "the method of selection, length of term and the number of board members of each public school academy subject to its jurisdiction." MCL 380.503(5). Additionally, a PSA may employ an education-management corporation, with the approval of the

PSA's authorizing body, to manage or operate the PSA or provide administrative, managerial or instructive staff to the PSA. MCL 380.503c; MCL 380.503(6)(k), (n). A PSA, its incorporators, board members, officers, employees and volunteers are covered by governmental immunity. MCL 380.503(8).

A PSA may not levy ad valorem property taxes or another tax for any purpose, MCL 380.503(9), or charge tuition, MCL 380.504(2). A PSA may enter, however, into an "agreement, mortgage, loan or other instrument of indebtedness" with a third party. MCL 380.503b. It may borrow money and issue bonds. MCL 380.504a(g). It may also "solicit and accept any grants or gifts for educational purposes and to establish or permit to be established on its behalf 1 or more nonprofit corporations the purpose of which is to assist the public school academy in the furtherance of its public purposes." MCL 380.504a(f). A PSA may enter into binding legal agreements with persons or entities as necessary for the operation, management, financing, and maintenance of the public school academy and sue and be sued in its name. MCL 380.504a(a), (d). Additionally, a PSA may "acquire, hold, and own in its own name real and personal property, or interests in real or personal property, for educational purposes by purchase, gift, grant, devise, bequest, lease, sublease, installment purchase agreement, land contract, option, or condemnation, and subject to mortgages, security interests, or other liens; and to sell or convey the property as the interests of the public school academy require." MCL 380.504a(b). A PSA, "with the approval of the authorizing body, may employ or contract with personnel as necessary for the operation of the public school academy, prescribe their duties, and fix their compensation." MCL 380.506.

Despite the powers and authority conferred by the Legislature on PSAs, PSAs are under the ultimate and immediate control of the authorizing bodies. *Council of Organizations*, 455 Mich at 573. The authorizing bodies serve as the fiscal agent for each PSA, and are invested with the power of oversight and the ability to revoke a charter any time an authorizing body has a reasonable belief that grounds for revocation exist. MCL 380.502(2)(a), MCL 380.507(1)(d)-(h), (3); *Council of Organizations*, 455 Mich at 573.

Finally, the board of each of the authorizing bodies is either publically elected or appointed by public bodies. The public maintains control of the PSAs through the authorizing bodies. *Council of Organizations*, 455 Mich at 575-576.

## C. A PSA IS NOT A POLITICAL SUBDIVISION OF THE STATE

Based on the foregoing review of the structure, operations and powers of a PSA, as set forth in Act 362, I would find that a PSA lacks the distinctive "marks" of a "political subdivision of the state" for purposes of § 33, and is therefore not a "local government" for purposes of § 30.

First, a PSA has no direct electorate. A PSA is responsible to its authorizing body for its management of the public school academy and the provision of educational services. In turn, the authorizing body is responsible to its electorate for the degree of oversight the body exercises or fails to exercise over the PSA to ensure the PSA operates within the terms of its charter and under the law. Thus, the electorate within the authorizing body's geographical boundaries plays a less direct role in the management of the body corporate of a PSA than does the electorate in the management of the body corporate of a political subdivision of the state.

Second, a PSA possesses a lesser capacity for self-governance than other bodies corporate that are traditionally recognized as political subdivisions. Each PSA is under the ultimate and immediate control of its authorizing body, which our Legislature invested with the powers to charter, to exercise oversight over PSA operations, to revoke a charter when reasonable grounds for revocation exist, and to serve as the fiscal agent for each PSA for purposes of the receipt of school aid funds from the state.

The absence of these two crucial and distinctive "marks" of a political subdivision sustains plaintiffs' position that a PSA is not a local government for purposes of § 30. Given the common characteristics of a political subdivision of the state, as understood and recognized both before and after the ratification of the Headlee Amendment, as reflected by OAG 1963-1964, No. 4037 and *Egleston*, I can only conclude that the great mass of the people who ratified the Headlee Amendment would not have understood a PSA to be a political subdivision of the state for purposes of § 33 and, therefore, a local government for purposes § 30. *Adair v Michigan*, 497 Mich 89, 101; 860 NW2d 93 (2014); *CVS Caremark v State Tax Comm*, 306 Mich App 58, 61; 856 NW2d 79 (2014). A PSA may be a component of a local government, but it is not itself a "local government." [1]

## II. SCHOOL DISTRICT

Plaintiffs also argue that state funds disbursed to PSAs may not be included in the State's calculation of the proportion of total state spending paid to units of local government under § 30 because a PSA is not a "school district" as the term was commonly understood by the ratifiers of the Headlee Amendment in 1978. Again, I agree.

This Court has long recognized that a school district is a political subdivision of the state. *Nalepa v Plymouth-Canton Community School District*, 207 Mich App 580, 586-587; 525 NW2d 897 (1994). This was the common understanding at the time of the ratification of the Headlee Amendment. As I have already noted, however, a PSA lacks several crucial and distinctive "marks" of a political subdivision and, thus, is not a political subdivision of the state. If a PSA is not a political subdivision of the state, then it cannot be a school district for purposes of § 33 or a local government for purposes of § 30. Thus, the question becomes whether, by designating PSAs as "limited purpose" school districts in MCL 380.501(1), the Legislature intended to create a new species of school district for the purpose of subjecting PSAs to an application of the Headlee Amendment.

As previously noted, our Legislature conferred upon PSAs the designation of limited-purpose school districts in MCL 380.501(1), which provides in part: "A public school academy is a public school under section 2 of article VIII of the state constitution of 1963, [and is a]

---

[1] See also *Paquin v St. Ignace*, ___ Mich ___, ___; ___ NW2d ___ (2019) (Docket No. 156823); slip op at 9-10 (noting, albeit in a decision involving Const 1963, art 11, § 8, that it is irrelevant whether an entity performs similar functions to that of a local government; to pass constitutional scrutiny, the relevant question is whether the entity *is* itself a local government).

school district for the purposes of section 11 of article IX of the state constitution of 1963." Article 8, § 2 obligates our Legislature to maintain and support a system of free public elementary and secondary schools by providing for and financing a system of free public schools. *LM*, 307 Mich App at 697. Article 9, § 11 mandates that "[t]here shall be established a state school aid fund which shall be used exclusively for aid to school districts, higher education, and school employees' retirement systems, as provided by law." Const 1963, art 9, § 11. Article 9, § 11 also embodies the Proposal A amendment and thereby guarantees local schools districts funding at the minimum level it provided in fiscal year 1994-95, or approximately $5,000 per pupil. Const 1963, art 9, § 11; *Durant v Michigan*, 251 Mich App 297, 308; 650 NW2d 380 (2002). The limited-purpose designation is also conferred in § 3 of the School Aid Act of 1979. MCL 388.1603(7).

In MCL 380.501(1), the Legislature designated a PSA as a "school district" for a single, specific constitutional purpose—the receipt of state school aid funding. The Legislature made no reference to the Headlee Amendment in MCL 388.1603(7). The Legislature did make clear, however, that a PSA is a "public school," a "body corporate" and "a governmental agency." MCL 380.501(1). The Legislature also indicated that "[t]he powers granted to a public school academy . . . constitute the performance of essential public purposes and governmental functions of this state." MCL 380.501(1). The language employed in MCL 380.501(1) clearly evinces that the Legislature knew how to make PSAs school districts for limited constitutional purposes. The fact that our Legislature did not expressly confer upon PSAs the status of school districts for purposes of the Headlee Amendment, generally, or for purposes of § 30, specifically, is compelling evidence of the legislators' intent not to confer such status. See *Johnson v Recca*, 492 Mich 169, 176 n 4; 821 NW2d 520 (2012). Rather, the language used in MCL 380.501(1) indicates that the Legislature intended to confer school-district status on PSAs for the *sole* purpose of receiving state aid to schools from the State School Aid Fund. OAG 1995-1996, No. 6915, p 204 (September 4, 1996). The Legislature did not intend to equate PSAs with school districts as a general proposition.

This conclusion is further supported by language within Act 362, which distinguishes PSAs from school districts. For example, MCL 380.503(9) provides in pertinent part:

> A public school academy may not levy ad valorem property taxes or another tax for any purpose. However, operation of 1 or more public school academies by a school district or intermediate school district does not affect the ability of the school district or intermediate school district to levy ad valorem property taxes or another tax.

In a similar vein, MCL 380.503a provides:

> If a school district or intermediate school district applies for and obtains a contract to operate 1 or more public school academies under this part, the power of the school district or intermediate school district to levy taxes for any purpose under this act is not affected by the operation of a public school academy by the school district or intermediate school district. Revenue from taxes levied by a school district or intermediate school district under this act or bonds issued by a school district or intermediate school district under this act may be used to

support the operation or facilities of a public school academy operated by the school district or intermediate school district in the same manner as that revenue may be used under this act by the school district or intermediate school district to support school district or intermediate school district operations and facilities. This section does not authorize a school district or intermediate school district to levy taxes or to issue bonds for any purpose that is not otherwise authorized under this act.

Additionally, a school district may authorize the organizing of a PSA, must serve as the fiscal agent for each PSA authorized by the school district and is invested with the power of oversight and the ability to revoke a charter any time the authorizing school district has a reasonable belief that grounds for revocation exist. MCL 380.502(2)(a), MCL 380.507(1)(d)-(h), (3); *Council of Organizations*, 455 Mich at 573. These statutory provisions reflect a clear intent by the Legislature to subordinate a PSA to its authorizing school district, not to create a new species of school district or a body corporate that is co-equal in the hierarchy of local government with school districts.

For these reasons I would conclude that a PSA is neither a "political subdivision of the state," generally, nor a "school district," specifically, within the meaning of § 33 of the Headlee Amendment and, therefore, is not a species of local government for purposes of § 30. Accordingly, I would find that plaintiffs were entitled to summary disposition on Count II of their complaint. In all other respects, I concur with the lead opinion.

/s/ Patrick M. Meter