ADAIR v STATE OF MICHIGAN (ON SECOND REMAND)

Docket No. 230858. Submitted March 22, 2006, at Lansing. Decided July 3, 2008, at 9:00 a.m.

    Daniel Adair and others, including school districts, intermediate school districts, and taxpayers, brought an original action in the Court of Appeals against the state of Michigan and others, seeking a declaration that the state had failed to honor its funding obligations under the second sentence of Const 1963, art 9, § 29, the Headlee Amendment, with regard to certain activities and services that state law or regulation obligated the plaintiff school districts to provide. The Court of Appeals, HOLBROOK, JR., P.J., and TALBOT, J. (SAAD, J., dissenting), granted summary disposition for the defendants and dismissed the case. 250 Mich App 691 (2002). The plaintiffs appealed to the Supreme Court, which affirmed in part, reversed in part, and remanded, holding that the only claim on which relief might be granted to plaintiffs was a record-keeping requirement set forth in MCL 388.1752 and Executive Order No. 2000-9. 470 Mich 105 (2004). On remand, the Court of Appeals, SAAD, P.J., and TALBOT and FORT HOOD, JJ., granted summary disposition in favor of the defendants and dismissed the plaintiffs' remaining claims, holding that the plaintiffs failed to present documentary support from which it can be inferred that either MCL 388.1752 or Executive Order No. 2000-9 mandates the school districts to actively participate in the maintenance of data that the state requires for its own purposes. 267 Mich App 583 (2005). The Supreme Court, in lieu of granting leave to appeal, vacated the judgment on remand of the Court of Appeals and remanded the matter to the Court of Appeals for a reevaluation of the plaintiffs' claims under both the "new activity or service" and the "increase in the [level] of any activity or service" prongs of the prohibition of unfunded mandates in Const 1963, art 9, § 29, in accordance with the Supreme Court's conclusion in *Adair*, 470 Mich at 130, that the plaintiffs have alleged that the state is not merely requiring different data from the school districts, but also requiring the districts to actively participate in maintaining data that the state requires for its own purposes. 474 Mich 1073 (2006). On second remand, the Court of Appeals employed the referral procedure prescribed by MCL 600.308a(5), and appointed former Wayne

Circuit Judge Pamela R. Harwood to serve as a special master to hear the remaining claims in this case. The special master issued an opinion in which she concluded that the state violated the prohibition on unfunded mandates (POUM) clause of Const 1963, art 9, § 29 because the record-keeping obligations imposed by the state on the school districts require the districts to actively participate in collecting, maintaining, and reporting data that the state requires for its own purposes only.

On second remand, the Court of Appeals *held*:

1. To demonstrate the existence of an offloading of state funding responsibilities and to demonstrate actual or imminent injury, the school districts must only establish an increase in the level of activity or services mandated by the state and a complete failure on the part of the state to provide any funding to offset the necessary costs to be incurred by the districts in the provision of the increased level of services or activities.

2. The evidence supports the special master's finding that, through the implementation of the databases, the state is requiring the districts to actively participate in collecting, maintaining, and reporting data that the state requires for its own purposes only. The evidence supports the special master's finding that the data-collection and reporting requirements effectuated through the Center for Educational Performance and Information resulted in an increase in the level of activity beyond that required before the conclusion of *Durant v Michigan*, 456 Mich 175 (1997), and beyond the level required as of December 23, 1978.

3. The record establishes that the data-collection and reporting implemented through the Center for Educational Performance and Information resulted in the state's offloading some of its responsibilities onto the districts and imposing on the districts obligations to undertake several new activities and to engage in an increased level of activities within the meaning of the POUM clause.

4. Federal mandates enforced by the state do constitute state requirements implicating the Headlee Amendment.

5. The special master erroneously concluded that the state had offloaded error-checking functions onto the districts. The state's motion for summary disposition with regard to this claim must be granted.

6. The state has failed to fund the necessary costs associated with the data-collection and reporting mandates associated with the Center for Educational Performance and Information.

7. The presence of the term "appropriation" in the POUM clause reflects the intent of the voters that the Legislature actually determine the necessary costs associated with the implementation of new legislative mandates and then appropriate that amount for the express purpose of funding the new mandate. The POUM clause does not reflect any intent to allow the Legislature to appropriate a certain level of "discretionary" funds to the districts and then remove some of the "discretion" afforded the districts by mandating how some of those funds should be used.

8. With the exception of the costs associated with implementing the Single Record Student Database, the state has not funded the necessary costs associated with the data-collection and reporting mandates associated with the Center for Educational Performance and Information, as required by the POUM clause.

9. The plaintiffs' suit cannot be characterized as having been "sustained" within the meaning of Const 1963, art 9, § 32, because the plaintiffs' other claims have been rejected by the Court of Appeals. The plaintiffs' request for attorney fees must be denied.

Declaratory judgment in favor of the plaintiffs granted; summary disposition in favor of the state denied, except with respect to the claim that the special master erroneously concluded that the state had offloaded error-checking functions onto the school districts.

1. CONSTITUTIONAL LAW — PROHIBITION OF UNFUNDED MANDATES.

A unit of local government, in order to demonstrate the existence of offloading of state funding responsibilities to the unit and actual or imminent injury, need only establish an increase in the level of activity or services mandated by the state and a complete failure on the part of the state to provide any funding to offset the necessary costs to be incurred by the unit in the provision of the increased level of services or activities (Const 1963, art 9, § 29).

2. CONSTITUTIONAL LAW — PROHIBITION OF UNFUNDED MANDATES.

Federal mandates enforced by the state do constitute state requirements for purposes of the constitutional provisions regarding state financing of activities or services required of local units of government (Const 1963, art 9, § 29).

3. CONSTITUTIONAL LAW — PROHIBITION OF UNFUNDED MANDATES.

The constitutional prohibition of unfunded mandates placed on a unit of local government by the state does not permit the Legislature to appropriate to school districts a certain level of discretion-

ary funds and then remove some of the discretion afforded the districts by mandating how some of those funds should be spent (Const 1963, art 9, § 29).

*Thrun Law Firm, P.C.* (by *Dennis R. Pollard* and *Richard E. Kroopnick*), for the plaintiffs.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Jane O. Wilensky* and *D.J. Pascoe*, Assistant Attorneys General, for the defendants.

ON SECOND REMAND

Before: SAAD, C.J., and TALBOT and FORT HOOD, JJ.

TALBOT, J. By prior order, we appointed a special master to hear the remaining claims in this school-financing case brought under § 29 of the Headlee Amendment, Const 1963, art 9, §§ 25-34. We charged the special master with the task of determining whether the record-keeping obligations imposed on plaintiff school districts as a result of MCL 388.1752 and Executive Order No. 2000-9 constituted either a new activity or service or an increase in the level of state-mandated activity or service within the meaning of the Headlee Amendment's prohibition of unfunded mandates. The special master has concluded that the state violated the second sentence of § 29, more commonly referred to as the "prohibition on unfunded mandates" or POUM clause, because the record-keeping obligations imposed by the state on the school districts require the districts to actively participate in collecting, maintaining, and reporting data that the state requires for its own purposes only. We have reviewed the extensive evidentiary record created by the special master and the parties, the briefs, and the report of the special master. We adopt the conclusions of

law and factual findings of the special master, with the modifications detailed below. Accordingly, we enter a declaratory judgment in favor of plaintiffs. We deny the state's motion for summary disposition in all but one regard.

### BURDEN OF PROOF

To establish a violation of the POUM clause, a plaintiff "must show that the state-mandated local activity was originated without sufficient state funding after the Headlee Amendment was adopted or, if properly funded initially, that the mandated local role was increased by the state without state funding for the necessary increased costs." *Adair v Michigan*, 470 Mich 105, 111; 680 NW2d 386 (2004). The state argues that plaintiff school districts must prove, as an essential element of their claim under the POUM clause, that the implementation of the mandates required the districts to actually incur specific costs, i.e., out-of-pocket expenses in a quantified amount. We reject the state's position, as did the special master, albeit for reasons other than those advanced by the special master.

This Court has twice ruled, at different stages of the same action, that the plaintiff school districts in a Headlee challenge establish "a prima facie case by showing the actual costs to all the school districts for each of the mandated services." *Durant v Dep't of Ed (After Remand, On Third Remand)*, 213 Mich App 500, 503; 541 NW2d 278 (1995), aff'd in part *sub nom Durant v Michigan*, 456 Mich 175 (1997), reconsideration den and lv den 456 Mich 924 (1998); *Durant v Dep't of Ed (On Third Remand)*, 203 Mich App 507, 514; 513 NW2d 195 (1994). Likewise, our Supreme Court has recognized the need to determine with specificity the amount of necessary costs incurred for a mandated

activity, including whether such costs fall within the de minimis exclusion of MCL 21.232(4). *Oakland Co v Michigan*, 456 Mich 144, 165; 566 NW2d 616 (1997) (Opinion by KELLY, J.) (cost of county foster-care services).

Unlike the present action, both the *Durant* and *Oakland Co* actions presented challenges brought pursuant to the first sentence of § 29 of the Headlee Amendment, which is also referred to as the "maintenance of support" or MOS clause. *Adair*, 470 Mich at 111; *Oakland Co*, 456 Mich at 149 (Opinion by KELLY, J.); *Durant v State Bd of Ed*, 424 Mich 364, 378-379; 381 NW2d 662 (1985). The MOS clause provides: "The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law." Const 1963, art 9, § 29. "[T]o establish a Headlee violation under the MOS clause, the plaintiff must show '(1) that there is a continuing state mandate, (2) that the state actually funded the mandated activity at a certain proportion of necessary costs in the base year of 1978-1979, and (3) that the state funding of necessary costs has dipped below that portion in a succeeding year.' " *Adair*, 470 Mich at 111.

Claims brought under the MOS clause involve determinations of specific "statewide-to-local district funding ratio[s] . . . ." *Schmidt v Dep't of Ed*, 441 Mich 236, 249-250; 490 NW2d 584 (1992); *Durant*, 213 Mich App at 505. Such ratios are determined in the following manner:

> This approach requires an initial calculation of the proportion of statewide funding for a particular mandated activity to the total necessary costs of providing that activity. The necessary costs to each local unit in the funding year at issue are then calculated. Next, the proportion of state financed funding for the activity or service

> in the base year is compared to the proportion of funding provided to the district in the year at issue. The state is obligated to afford each unit providing the activity or service the same portion of funding that the state provided on a statewide basis in the year that the Headlee Amendment was ratified. [*Schmidt*, 441 Mich at 250.]

Thus, by its very nature, the determination of ratios involves the quantifying of the necessary costs incurred by the school districts in specific dollar amounts.

Claims brought under the POUM clause, as is the case here, by contrast, do not involve determinations of statewide to local district funding ratios, but instead address future services or activities and seek funding for the future implementation of newly mandated services or activities. *Wayne Co Chief Executive v Governor*, 230 Mich App 258, 266; 583 NW2d 512 (1998). The remedy required in such actions is not an award of damages, but instead "comprises a resolution of the parties' prospective rights and obligations by declaratory judgment." *Id.* at 266. Because awards of money damages are not generally at issue, *id.* at 267, and because this Court lacks authority to order the Legislature to appropriate funds, *Musselman v Governor (On Rehearing)*, 450 Mich 574, 577 (BRICKLEY, C.J.), 582 (BOYLE, J.); 545 NW2d 346 (1996); *Musselman v Governor*, 448 Mich 503, 524; 533 NW2d 237 (1995), the goal of a declaratory judgment issued in a POUM Headlee action is only to provide sufficient notice so that "the state will be aware of the financial adjustment necessary to allow for future compliance." *Oakland Co*, 456 Mich at 166 (Opinion by KELLY, J.). Such notice may be provided without requiring the school districts to demonstrate out-of-pocket expenses in a specifically quantified amount. Indeed, as the evidence adduced before the special master clearly demonstrated, our Legislature possesses the ability to respond to its obligations

under the Headlee Amendment without first requiring the school districts to demonstrate actual costs to be incurred, as reflected by its 2002 appropriation of $2 per pupil ($3.4 million) in categorical funding to offset some of the costs incurred by the districts in implementing the reporting requirements regarding the Single Record Student Database (SRSD), one of the databases maintained by the Center for Educational Performance and Information (CEPI).[1]

Furthermore, the plaintiff in a declaratory-judgment action bears "the burden of establishing the existence of an actual controversy, as well as the burden of showing that . . . it has actually been injured or that the threat of imminent injury exists." 22A Am Jur 2d, Declaratory Judgments, § 239, p 788. To demonstrate that the school districts have actually been injured or are confronted with an imminent injury, plaintiffs need only show that the "mandated local role was increased by the state without state funding for the necessary increased costs." *Adair*, 470 Mich at 111. In the case at bar, plaintiffs have alleged

> "that the state is not merely requiring different data from the school districts, but also requiring the districts to actively participate in maintaining data that the state requires for its own purposes. An off-loading of state funding responsibilities onto local units of government without the provision of funds presents a colorable claim under Headlee." [*Adair v Michigan*, 474 Mich 1073 (2006).]

To demonstrate the existence of such an off-loading of state funding responsibilities and to demonstrate actual or imminent injury, we conclude that the school dis-

---

[1] Transcript from July 10, 2007, at 194-201; Transcript from July 11, 2008, at 606-607; Transcript from July 17, 2007, at 984, 1069; Transcript from July 18, 2007, at 1185-1186; Transcript from July 25, 2007, at 1753; Transcript July 24, 2007, at 1700.

tricts need only establish (1) an increase in the level of activity or services mandated by the state and (2) a complete failure on the part of the state to provide any funding to offset the necessary costs to be incurred by the districts in the provision of the increased level of services or activities.

### NEW OR INCREASED ACTIVITIES OR SERVICES

Notwithstanding the state's assertion to the contrary, there is evidentiary support for the special master's findings that, "[t]hrough the implementation of the databases, the state is requiring the districts to actively participate in collecting, maintaining and reporting data that the state requires for (only) its own purposes," and that the data-collection and reporting requirements effectuated through the CEPI resulted in "an increase in the level of activity beyond that required prior to the conclusion of Durant I and . . . to existing law as of December 23, 1978."

The evidence adduced before the special master establishes that the state is requiring districts to actively participate in collecting, maintaining, and reporting data the state requires for its own purposes. The federal government requires the states to report data on a dis-aggregated student-by-student, teacher-by-teacher, or building-by-building basis to receive federal funds under the No Child Left Behind Act, PL 107-110. 115 Stat 1425.[2] With future federal requirements in mind, the state employs the CEPI and its databases as a warehouse and holds within that warehouse such quantities of discrete information that the state is in a

---

[2] Transcript from July 24, 2007, at 1575-1578; Transcript from July 25, 2007, at 1808-1810; Transcript from July 31, 2007, at 1952-1953, 1984, 2023; Stipulation in lieu of testimony of defendants' witnesses, Exhibit 3(D) at 9; Exhibit 5(D) at 37-40; Exhibit 12(D) at 16-17, 29.

position to "more flexibly answer" the ever-changing questions posed by the federal government, "without going back to the districts time and time again and re-asking for them to aggregate the data differently, group it differently, that is really the impetus of why the thought came up for creating more discrete data sets."[3] One of the consequences of this approach to data gathering has been, for example, that the school districts are being required to collect and report to the Financial Information Database (FID) detailed financial information that is of no use to the districts and that they might not otherwise record but for the FID reporting requirements.[4] If the state were not requiring the school districts to report such data to the CEPI, the state would have to send personnel to each district to gather the data.[5]

Furthermore, although the CEPI was intended, in part, to allow the school districts to use the data as an analytical tool to answer questions about student and teacher performance and to generate reports targeted to improving student achievement, the districts have been unable to access the databases in any meaningful manner.[6] Although the school districts can obtain a limited number of reports from the CEPI on the basis of data they supply, the CEPI lacks the requisite staff to provide any custom data reports that might be requested by a school administrator for use by a district.[7]

---

[3] Transcript from July 31, 2007, at 1985; see also Transcript from July 31, 2007, at 2001, 2027, 2057; Stipulation in lieu of testimony of defendants' witnesses, Exhibit 11(D) at 93, 123.

[4] Transcript from July 10, 2007, at 316; Transcript from July 11, 2007, at 570-571; Transcript from July 17, 2007, at 932-933, 987-988; Transcript from July 18, 2007, at 1150; Transcript from July 31, 2007, at 1940.

[5] Transcript from July 24, 2007, at 1693-1694.

[6] Transcript from July 18, 2007, at 1267-1272; Transcript from July 25, 2007, at 1833-1834, 1850-1853.

[7] Transcript from July 24, 2007, at 1524-1525; Transcript from July 25, 2007, at 1766, 1799-1800, 1854-1856.

The record also establishes that the data collection and reporting implemented through the CEPI resulted in the state's offloading some of its responsibilities onto the districts and, therefore, imposing upon the districts obligations to undertake several new activities and to engage in an increased level of activities within the meaning of the POUM clause. The state made a conscious decision to offload onto the districts the new activity of designing and updating the software necessary to perform some of the data-collection, storage, and reporting obligations in an attempt to avoid a Headlee funding obligation and as an acknowledgment of the CEPI's lack of funding necessary to develop the software itself.[8] Additionally, the data-collection and reporting obligations resulted in the districts' reporting to the state new types of data and significantly greater amounts of data, at a more discrete level. This information is no longer reported to the state in aggregate form, but instead is reported on a student-by-student, employee-by-employee, and building-by-building basis.[9] The burdens associated with these requirements were particularly acute at the time each database was brought online and the districts had to gather and format the data and report that data to each new database for the first time. These burdens are also

[8] Transcript from July 25, 2007, at 1729-1731, 1755, 1778, 1780-1781.

[9] Transcript from July 10, 2007, at 158-159, 169-170, 179, 224-225, 227-231, 244, 246-249, 272, 284-285; Transcript from July 11, 2007, at 385-386, 417-418, 421, 620, 650, 656; Transcript from July 12, 2007, at 795-796, 806, 817-818, 893-894; Transcript from July 17, 2007, at 939, 950, 955-956, 961-962, 1029-1032, 1035; Transcript from July 18, 2007, at 1111, 1148-1149, 1158-1159, 1215-1217, 1225-1227, 1250-1254, 1257; Transcript from July 19, 2007, at 1412; Transcript from July 24, 2007, at 1597; Transcript from July 25, 2007, at 1752; Transcript from July 31, 2007, at 1940; Stipulation in lieu of testimony of plaintiffs' witnesses, Exhibit 9(P) at 18; Exhibit 14(P) at 13-14; Exhibit 17(P) at 20; Exhibit 18(P) at 41.

especially acute during the periods when the districts prepare and submit new reports. With the exception of the FID, for which there is evidence that maintenance of the data required to be reported remains labor intensive throughout the year, maintenance of the data for the SRSD, the Registry of Educational Personnel (REP), and the School Infrastructure Database (SID) requires minimal levels of staff time.[10]

The state correctly observes, by way of a defense, that any increase in the data-reporting burden imposed upon the districts is not the consequence of any obligation imposed by Executive Order No. 2000-9, which only created the CEPI, or by MCL 388.1752 (now MCL 388.1694a), which confers authority on the CEPI to act, but rather is the consequence of other state and federal laws, such as Michigan's School Safety Initiative and the federal government's No Child Left Behind Act.[11] The fact that the increases in state-mandated activities required of the school districts is the product of other state statutes is no defense for the state. Headlee prohibits the imposition of unfunded mandates no

---

[10] Transcript from July 10, 2007, at 170-171, 197, 349-350, 360; Transcript from July 11, 2007, at 529, 542-543, 549-552, 624-625, 628-631; Transcript from July 12, 2007, at 689-690, 720, 778, 797-800, 804, 806-809, 832, 850, 864-865, 870-872, 889, 903-904, 907, 1066-1067; Transcript from July 17, 2007, at 978, 980, 983, 1035-1037; Transcript from July 18, 2007, at 1166, 1230-1232, 1240-1241, 1247; Stipulation in lieu of testimony of plaintiffs' witnesses, Exhibit 4(D) at 20-21; Exhibit 4(D) at 20-21; Exhibit 6(D) at 29; Exhibit 7(P) at 15-16, 41-42; Exhibit 7(D) at 43-44; Exhibit 11(P) at 12, 34; Exhibit 12(P) at 22-23; Exhibit 14(P) at 39-40; Exhibit 15(P) at 18; Exhibit 18(D) at 46; Exhibit 19(P) at 11, 14, 30, 33.

[11] Transcript from July 10, 2007, at 153, 157, 244; Transcript from July 11, 2007, at 441, 673; Transcript from July 19, 2007, at 1356, 1359-1360; Transcript from July 24, 2007, at 1589-1590, 1648, 1652, 1659-1661; Transcript from July 25, 2007, at 1752-1753, 1754-1756, 1788, 1807-1809, 1845-1847, 1849; Transcript from July 31, 2007, at 1985, 2001, 2003, 2027, 2056-2057.

matter what particular state statute imposes such mandates. Furthermore, the state's contention that federal mandates do not constitute "state requirements" implicating Headlee contradicts the pronouncement of our Supreme Court that there is no exception in § 29 for federal mandates enforced by the state. *Durant*, 456 Mich at 190-196.

Nevertheless, all is not lost for the state. The state's position that the special master erroneously concluded that the state had offloaded error-checking functions onto the districts has support in the record. The evidence demonstrates that most of the error-checking functions are performed by computers employing error-checking software provided by the CEPI. Moreover, the evidence demonstrates that the districts have always had a concomitant duty to ensure the accuracy of data reported to the state, even before the CEPI came into existence, and, hence, played a role in ensuring the accuracy of data reported.

### FUNDING OF THE MANDATE

We agree with the special master that the state has failed to fund the necessary costs associated with the data-collection and reporting mandates associated with the CEPI. Again, we reach our conclusion for reasons other than those relied upon by the special master.

With the ratification of Proposal A, Const 1963, art 9, § 11, and the passage of its enacting legislation, the method of financing Michigan's public schools changed radically, moving from a funding system primarily financed by the levying of a local millage on real property to a system financed by an increase in the state sales tax and various use taxes. *Durant v Michigan (On Remand)*, 238 Mich App 185, 195-197; 605 NW2d 66 (1999). This change in the funding system shifted the

responsibility for generating school funding from the local school districts to the state. As the evidence adduced before the special master demonstrated, 75 percent of the funding received by local school districts for the 2007 fiscal year came from the state. The remaining 25 percent came from local revenues, including revenue generated by a levy of 18 mils on local non-homestead property.[12] By contrast, in the 1989-1990 school year, locally generated revenues funded 63 percent of the costs of school operations, with state-generated revenues funding the remaining 37 percent of those costs.[13]

The state supplies a significant portion of its funding to school districts from per-pupil funds commonly referred to as the "foundation allowance." *Id.* at 197. According to one witness, "the total revenue that a district is going to get for the lion's share of its activities is based on the number of kids that you have in the system times this foundation number."[14] The foundation allowance is composed of unrestricted funds that school districts may use for any school-related operational purpose authorized by law, e.g., to pay salaries, to provide transportation, to pay utilities, and to purchase textbooks and supplies. *Id.* at 197-198.

The state fulfills the constitutional obligations imposed by both Proposal A and Headlee by employing a "tripartite funding scheme," which has been referred to as the " 'three bucket' or the 'three pot' approach." *Durant v Michigan*, 251 Mich App 297, 299; 650 NW2d 380 (2002) (*Durant III*). The Legislature divides the foundation allowance amongst two of the three buckets. It allocates to the first bucket a per-pupil amount

---

[12] Transcript from July 25, 2007, at 1744-1745, 1759.

[13] Transcript from July 25, 2007, at 1743-1745.

[14] Transcript from July 18, 2007, at 1176.

sufficient to satisfy the base level of per-pupil funding guaranteed by Proposal A, which consists of the level of per-pupil funding provided in 1994-1995 (just over $4,000[15]). *Id.* at 299-302, 308. The Legislature then pours into the second bucket that portion of the foundation allowance that consists of the difference between the base level of per-pupil funding allocated to the first bucket and the total per-pupil foundation allowance provided by the state. The Legislature conditions a school district's receipt of the unrestricted funds in this second bucket, in part, on a district's supplying "data and other information required by state and federal law to the [CEPI] and the department [of education] in the form and manner specified by the center or the department . . . ." MCL 388.1622b(3)(c). Only state-provided funds fill this second bucket. The Legislature allocates to the third bucket those funds necessary to satisfy its Headlee obligation under the MOS clause, as determined by the *Durant* cases. *Durant III*, 251 Mich App at 300.

The state asserts that it has satisfied its obligation under Headlee to reimburse the districts for any increase in the necessary costs associated with the reporting requirements because the state has supplied the school districts with $3.5 billion in discretionary funds, contingent upon the districts' agreeing to comply with the CEPI's reporting requirements, from which the districts are expected to defray any costs associated with their reporting requirements. The special master rejected the state's position. She concluded, instead, that the state had off-loaded onto the districts the funding responsibilities associated with the data-collection, storage, and reporting obligations. Although

---

[15] Transcript from July 18, 2007, at 1178-1180; Transcript from July 25, 2007, at 1735, 1740.

acknowledging that the districts must pay for any CEPI-related costs and expenses from their general operating budget that is funded by unrestricted funds from the state, the special master opined that the fact that the state provides a percentage of school district funding does not mean that the state can impose additional mandates upon the districts without appropriating the necessary funds needed to perform those mandates. We agree.

In *Durant III*, this Court ruled that the Legislature may allocate that portion of the foundation allowance over and above the base level required by Proposal A to the "Headlee allocation bucket" and use those additional funds to satisfy the state's Headlee obligation under the MOS clause without violating the constitution. *Id.* at 308. The *Durant III* panel also ruled that that portion of the foundation allowance over and above the base level could be allocated to the "discretionary use bucket." *Id.* at 308-309. The panel did not address whether the Legislature could require the school districts to dip into the "discretionary use budget" to satisfy the state's Headlee obligation. To answer this question, the language of the POUM clause must be examined.

The POUM clause provides:

> A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. [Const 1963, art 9, § 29.]

When construing the language of the Headlee Amendment, the courts apply the rule of " 'common understanding,' " *Durant III*, 251 Mich App at 306, the parameters of which are as follows:

" 'A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding and ratified the instrument in the belief that that was the sense designed to be conveyed." ' " [*Durant*, 456 Mich at 192, quoting 1 Cooley, Constitutional Limitations (8th ed), p 143.]

The language of the POUM clause is clear and uncomplicated. It prohibits the Legislature from increasing the level of an activity or service beyond that required by existing law "unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs." According each term and phrase employed in the POUM clause its plain meaning, the language employed in the POUM clause reflects the voters' intent that the clause serve as a directive to the Legislature to appropriate and disburse the funds required to cover the necessary costs associated with implementing a new legislative mandate. At the heart of this directive lies the command to appropriate and disburse the funds to carry out new legislative mandates. The term "appropriation" commonly means a legislative body's act of prescribing a particular, special, or distinct use for particular money authorized to be paid from a public treasury. *Webster's New Twentieth Century Dictionary* (Unabridged 2d ed), p 91; *Random House Webster's College Dictionary* (2d ed, 1997), p 66; Black's Law Dictionary (5th ed), p 93. The presence of the term "appropriation" in the POUM clause reflects the intent of the voters that the Legislature actually determine the necessary costs associated

with the implementation of new legislative mandates and then appropriate that amount for the express purpose of funding the new mandate. The language of the POUM clause does not reflect any intent to allow the Legislature to appropriate a certain level of "discretionary" funds to the districts and then remove some of the "discretion" afforded the districts by mandating how some of those funds must be used. Indeed, "[s]uch a result is inconsistent with the historic ability of school districts to use funds as they see fit; a system of local control and local accountability is in keeping with the clear desire of the voters in passing the Headlee Amendment." *Durant*, 424 Mich at 386-387.

Our review of the evidentiary record reveals that the Legislature provided a one-time appropriation in the amount of $2 per pupil in 2002 ($3.4 million) to be disbursed to the districts to offset some of the initial costs incurred by the districts in implementing the reporting requirements of the SRSD. The evidence also established that the Legislature appropriated no other categorical funding for any of the costs associated with the districts' implementation of the reporting requirements of the REP, SID, or FID or their ongoing duty to comply with the reporting requirements for all four databases. Rather, the evidence established that the school districts are expected to shift funds from the discretionary funds bucket to cover any of the costs associated with their data-collection and reporting obligations. Indeed, none of the parties disputes, and the evidence unquestionably established, that each school district shifted its existing resources funded by the discretionary monies appropriated by the Legislature to comply with the data-collection and reporting requirements.[16] On this factual predicate, with the exception of

---

[16] See, e.g., Transcript from July 18, 2007 at 1276.

the costs associated with implementing the SRSD, the state has not funded the necessary costs associated with the data-collection and reporting mandates associated with the CEPI, as required by the POUM clause.

ATTORNEY FEES

Finally, plaintiffs request that this Court award plaintiffs their costs incurred in prosecuting this Headlee action, including an award of a reasonable attorney fee. Const 1963, art 9, § 32, governs the awarding of costs and provides:

> Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31, inclusive, of this Article and, if the suit is sustained, shall receive from the applicable unit of government his costs incurred in maintaining such suit.

Although plaintiffs have sustained their claim with regard to the data-collection and reporting requirements, it must be noted that this claim is but one of many plaintiffs initially raised in this action. Plaintiffs' other claims were rejected by this Court. *Adair*, 250 Mich App 691. This Court's decision with regard to those claims was sustained by our Supreme Court. *Adair*, 470 Mich 105. Under these circumstances, plaintiffs' suit cannot be characterized has having been "sustained" within the meaning of § 32. Accordingly, we decline plaintiffs' request for attorney fees.

A declaratory judgment is granted in favor of plaintiffs consistent with this opinion. Summary disposition in favor of the state is denied except with regard to its claim that the special master erroneously concluded that the state had offloaded error-checking functions onto the school districts. No costs are awarded.